Exhibit 1

# United States District Court

_____CENTRAL_____ DISTRICT OF _____CALIFORNIA_____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Funds and/or securities at Alliance Bernstein up to $6,323,250 in account 039-95414;  up to $1,400,000 in account 079-59018; up to $1,800,000 in account 888-90806; up to $175,284 in account 888-78372, formerly  039-95415; up to $175,284 in account 888-78373, formerly 039-95416; up to $175,088 in account 888-78374, formerly 039-95417; and up to $175,284 in account 888-78375, formerly 039-95418.

**SEIZURE WARRANT**

**CASE NUMBER:**  2:17-MJ-2420

TO:  FEDERAL BUREAU OF INVESTIGATION  and any Authorized Officer of the United States, Affidavit(s) having been made before me by  SPECIAL AGENT DANIEL M. PARKER  who has reason to believe that in the Central District of California there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Funds and/or securities at Alliance Bernstein up to $6,323,250 in account 039-95414;  up to $1,400,000 in account 079-59018; up to $1,800,000 in account 888-90806; up to $175,284 in account 888-78372, formerly  039-95415; up to $175,284 in account 888-78373, formerly 039-95416; up to $175,088 in account 888-78374, formerly 039-95417; and up to $175,284 in account 888-78375, formerly 039-95418.

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(b), 982(b),  981(a)(1)(C), and 21 U.S.C. § 853(f).

**concerning a violation of Title**  18   **United States Code, Section(s)** 1343, 1956(c)(7)(A), and 1961(1)(B).

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

Alliance Bernstein, LLP is ordered to deliver said funds immediately and forthwith upon presentation of this warrant to the law enforcement agent serving the warrant, in the form of a cashier's check made payable to the United States Marshals Service.

YOU ARE HEREBY COMMANDED to seize within 14 days the property specified, serving this warrant and making the seizure in the daytime - 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to the undersigned judicial officer as required by law.  The recipient of this Warrant is HEREBY COMMANDED to comply with the duties and obligations set out in Attachment A attached hereto.

9/28/17 @ 12:59 p.m.
**Date and Time Issued**

_____Los Angeles, California_____
**City and State**

**Hon. Rozella A. Oliver, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

Rozella a. Oliv
**Signature of Judicial Officer**

AUSA JG/ga

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF

INVENTORY OF PROPERTY SEIZED PURSUANT TO THE WARRANT

## CERTIFICATION

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and will be returned through a filing with the Clerk's Office.*

*Date*: _____        _____
                                                                          *Executing Officer's Signature*


                                                                          _____
                                                                          *Printed Name and Title*

# United States District Court

**CENTRAL** _____ **DISTRICT OF** _____ **CALIFORNIA**

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)
Funds and/or securities at Alliance Bernstein up to
$6,323,250 in account 039-95414;  up to $1,400,000 in
account 079-59018; up to $1,800,000 in account 888-90806;
up to $175,284 in account 888-78372, formerly  039-95415;
up to $175,284 in account 888-78373, formerly 039-95416;
up to $175,088 in account 888-78374, formerly 039-95417;
and up to $175,284 in account 888-78375, formerly 039-
95418.

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**CASE NUMBER:**  2:17-MJ-2420

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| **9/28/2017** |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: SB   DEPUTY |

I, Daniel M. Parker, being duly sworn depose and say:

I am a Special Agent with the Federal Bureau of Investigation, and have reason to believe that

in the _____ **CENTRAL** _____ **District of** _____ **CALIFORNIA** _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

Funds and/or securities at Alliance Bernstein up to $6,323,250 in account 039-95414;  up to $1,400,000 in account 079-59018; up to $1,800,000 in
account 888-90806; up to $175,284 in account 888-78372, formerly  039-95415; up to $175,284 in account 888-78373, formerly 039-95416; up to
$175,088 in account 888-78374, formerly 039-95417; and up to $175,284 in account 888-78375, formerly 039-95418.

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(b), 982(b),  981(a)(1)(C), and 21 U.S.C. § 853(f).

**concerning a violation of Title** 18  **United States Code, Section(s)** 1343, 1956(c)(7)(A), and 1961(1)(B).

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

**Continued on the attached sheet and made a part hereof.**    X  Yes __ No

_____
/S/
**Signature of Affiant**

Sworn to before me, and subscribed in my presence

_____9/28/17_____
**Date**

**Los Angeles, California**
**City and State**

_____
**Hon. Rozella A. Oliver, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

Rozella a. Oli
**Signature of Judicial Officer**

**AUSA JG/ga**

**AFFIDAVIT**

I, Daniel M. Parker, being duly sworn, declare and state as
follows:

## I. INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") in the Los Angeles Field Office, and have
been so employed for approximately 25 years.  From 1992 to 2006,
I investigated white collar crime matters and was the case agent
for many telemarketing, investment fraud, securities fraud and
other investigations.  As part of these investigations I prepared
search, arrest and seizure warrants and testified in federal
court on a dozen or more occasions.  Since 2006, I have been
assigned to an asset forfeiture squad, where I have prepared
seizure warrants and civil complaints and completed forfeitures
of assets in a wide variety of FBI and other law enforcement
agency investigations.

2.      The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This
affidavit is intended to show merely that there is sufficient
probable cause for the requested warrant and does not purport to
set forth all of my knowledge of or investigation into this
matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II. <u>PROPERTY TO BE SEIZED</u>

3.    This affidavit is offered in support of applications for seizure warrants for the funds (and/or securities that were purchased with those funds) on deposit in the following three Eric Pulier Living Trust accounts for which Eric Pulier is trustee and sole signatory;  and for the funds (and/or securities that were purchased with those funds) on deposit in the following four Irrevocable Trust accounts in the names of Eric Pulier's children, at Alliance Bernstein, LLP, an investment management and research firm (the "SUBJECT FUNDS"):

        a. Up to $6,323,250 on deposit in the Eric Pulier Living Trust account numbered 039-95414 ("EP 5414");

        b. Up to $1,400,000 on deposit in the Eric Pulier Living Trust account numbered 079-59018 ("EP 9018");

        c. Up to $1,800,000 on deposit in the Eric Pulier Living Trust account numbered 888-90806 ("EP 0806");

        d. Up to $175,284 on deposit in the Chloe B. Pulier Irrevocable Trust account numbered 888-78372, which was formerly numbered 039-95415 ("CP 8372");

        e. Up to $175,284 on deposit in the Georgia B. Pulier Irrevocable Trust account numbered 888-78373, which was formerly numbered 039-95416 ("GP 5416");

f. Up to $175,088 on deposit in the Jacob E. Pulier Irrevocable Trust account numbered 888-78374, which was formerly numbered 039-95417 ("JP 5417");

g. Up to $175,284 on deposit in the William R. Pulier Irrevocable Trust account numbered 888-78375, which was formerly numbered 039-95418 ("WP 5418").

h. It is noted that all of the Pulier Living Trust accounts and irrevocable trust accounts in the names of Pulier's children set forth in this affidavit are investment accounts that may contain both cash and securities, and the balances provided herein may be a combination of both. However, transfers between accounts that are detailed below were all cash transactions as far as I am able to determine. All dates and amounts set forth in this affidavit are approximate and all figures are provided in whole dollar amounts.

### III. <u>STATUTORY BASES FOR SEIZURE</u>

4. There is probable cause to believe that the SUBJECT FUNDS represent or are traceable to proceeds of one or more violations of 18 U.S.C. § 1343 (wire fraud), a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B). The SUBJECT FUNDS are therefore subject to seizure pursuant to 18

U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. §
981(a)(1)(C).  In addition, the SUBJECT FUNDS are subject to
seizure pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(f)
because there is probable cause to believe that they would, in
the event of conviction, be subject to forfeiture, and an order
under 21 U.S.C. § 853(e) may not be sufficient to assure the
availability of the property for forfeiture.

IV. <u>SUMMARY OF INVESTIGATION</u>

    **A.**    **Background**

5.  The FBI is investigating an international securities
fraud and bribery scheme perpetrated by several individuals based
in California and Australia.  In or about September, 2013 and
continuing to a date unknown, but no earlier than September,
2015, the co-conspirators, conspired to fraudulently inflate the
revenue of ServiceMesh of Santa Monica, California,
("ServiceMesh") in order to generate unwarranted incentive-based
compensation for ServiceMesh shareholders and generate bribes and
kickbacks to their accomplices.  The result of this scheme was
that the publicly traded company Computer Sciences Corporation
("CSC") that acquired ServiceMesh in October 2013 overpaid by
approximately $98 million.

    **B.**    **The Principals**

7.  Eric Pulier ("Pulier") was the founder and, through
affiliated entities, approximately 30% owner of ServiceMesh, an

4

information technology ("IT") services company based in Santa Monica, California. Pulier was also the founder and owner of TechAdvisors LLC, a Delaware corporation.

8. Andrew Goldstein ("Goldstein") was Pulier's longtime friend and the control person for Ace Inc., aka Ace Foundation ("Ace"), a purported non-profit entity incorporated in Delaware. On an IRS Form W-9 completed by Goldstein for Ace on May 30, 2014, Ace's address was initially listed as ServiceMesh's corporate headquarters in Santa Monica, California. This was subsequently crossed-out and replaced with Goldstein's residence in Beverly Hills, California. On or about January 14, 2015, after the commencement of investigations by both Australian criminal authorities and CSC, Ace changed its name from Ace Inc. to Ace Foundation.

9. Jon Waldron ("Waldron") and his supervisor, Keith Hunter ("Hunter"), were IT executives at Commonwealth Bank of Australia ("CBA"), the largest publicly-traded company in Australia. Hans Gyllstrom ("Gyllstrom") was an IT consultant to CBA since 2007.

10. Brad Twynham ("Twynham") was a ServiceMesh employee based in Australia and, later, California, who helped manage the relationship with CBA.

5

11. CSC was a New York Stock Exchange listed company, headquartered in Falls Church, Virginia, and also involved in IT services.

**C.  The Contract**

12. Pursuant to an agreement entered into on October 29, 2013 and amended on November 15, 2013, CSC agreed to acquire all of ServiceMesh's outstanding stock for a fixed cash amount at closing plus a variable incentive payment ("Earnout Amount") based on ServiceMesh's revenues between January 1, 2013 and January 31, 2014 ("Earnout Period"). For every $1 in ServiceMesh revenue generated during the Earnout Period in excess of a $20 million floor, ServiceMesh shareholders would collectively receive approximately $10.15 in Earnout Amount, up to a maximum of approximately $137 million.

13. In February 2014, CSC calculated that ServiceMesh had generated approximately $29.7 million in revenue creditable toward the Earnout Amount, including approximately $10.4 million attributable to CBA. As a result of generating approximately $9.7 million in revenue in excess of the floor, ServiceMesh shareholders were credited an Earnout Amount of approximately $98 million. Without the revenue attributable to CBA, ServiceMesh shareholders would not have received any Earnout Amount.

6

**D.    The ServiceMesh/CBA Relationship**

14.   A review of the electronic communications involving the subjects of this investigation, which were produced by representatives of CBA and CSC, are cited herein.

15.   ServiceMesh began providing IT services to CBA in 2009.  Waldron, with direction from Pulier, actively lobbied CBA to hire Hunter as Waldron's supervisor at CBA and encouraged Hunter to accept the position.  On April 10, 2010, Pulier sent an email to Waldron regarding an upcoming dinner hosted by ServiceMesh for Hunter.  Pulier said, "The purpose of getting Keith [Hunter] with you earlier (before he gets the job) is to establish you as the go-to guy…leave him with a few take-aways: he wants the job, he is not in it alone, there are people at the bank that he can rely upon and trust."

16.   On July 27, 2011, Hunter's first day of employment at CBA, Pulier sent an email to Hunter profiling several CBA executives and projects, concluding with, "We have your back on every level."

17.   Pulier, Waldron, Twynham and Gyllstrom had a longstanding social connection.  In a July 2010 email, Twynham informed Pulier that Waldron had been advised by a senior CBA executive not to personally approve travel for Twynham and Pulier as "it would be a conflict of interest" and mentioned Waldron's "birthday bash in Canne [sic] as evidence of hos [sic]

friendship with you." In addition, Waldron invited Gyllstrom and Pulier to an April 2011 bachelor party for Twynham in Sydney, Australia. Twynham was best man in Waldron's 2012 wedding, to which Pulier was invited.

18. On May 24, 2011, Waldron sent an email to Pulier and Twynham that provided, "Where the money goes…(confidential of course)." Attached to the email was a document labeled as confidential and containing CBA's budgeted IT spending for 2011 and 2012.

19. The following emails demonstrate efforts by Waldron and Hunter to expedite the consummation of a deal whereby CBA would purchase security technology products by McAfee, Inc. ("McAfee") from ServiceMesh (the "CBA-McAfee" transactions) rather than procure them directly from McAfee or via equipment purchased from another vendor that included McAfee products.

20. On October 31, 2013, the day after the CSC acquisition of ServiceMesh was announced, a CBA colleague sent an email to Waldron responding to his inquiry about the current McAfee relationship, stating that it generated $2.4 million per year in business between CBA and McAfee. Later that day, Waldron forwarded that email to Hunter with his own message, "This is what I'm aiming to get thru on SM [ServiceMesh] paper. Have checked, and since the licenses are perpetual the full amount qualifies as in-year revenue. So here's $7m for them. It's now

with Brad [Twynham] and Eric [Pulier] to sign up a partner agreement with McAfee."

21.   On November 2, 2013, Twynham sent an email to Waldron asking if Waldron had "been able to find me a contact at McAfee to talk with?"  Waldron forwarded the email to a CBA colleague, who at the instruction of Waldron sent directly to Twynham the contact information for CBA's relationship manager at McAfee.

22.   On December 9, 2013, Twynham sent an email to Waldron indicating that ServiceMesh's proposal for the CBA-McAfee deal would be $8.8 million for three years.  Twynham stated, "…I need to sit down with you and explain what ServiceMesh need from a rev[enue] rec[ognition] perspective and work through those numbers…"

23.   On December 16, 2013, Twynham sent an email to Waldron indicating that Marcus Nicholson, a CBA employee who was tasked to review the CBA-McAfee contract, had raised several objections to various points.  Waldron forwarded the message to Hunter. The same day, Hunter sent a message to Waldron instructing Waldron to engage with Nicholson's supervisor and let the supervisor know that Waldron needed the supervisor to step in "ASAP."  The supervisor responded promptly, raising his own concerns regarding a deal that "came out of the blue" under a "challenging timeframe."  The supervisor further outlined the various deal reviews that were underway, including pricing

("…need to confirm that this is a better deal than the one we already had from McAfee themselves…initial calcs were that this was not a good deal"), legal ("just started the legal review today") and risk ("engaged today").

24. On December 16, 2013, a CBA risk manager sent an email that a risk assessment for the CBA-McAfee deal would take more than one day, to which Waldron replied, "…both Keith and I want this deal done ASAP. Within the next 48hrs max…we're just buying software! … Why are we even doing a risk assessment?"

25. On December 17, 2013, Nicholson asked Twynham for a break-out of the revenue for McAfee products versus ServiceMesh products "in order to valid [sic] this deal as making commercial sense." Waldron, who was copied on the correspondence, replied, "Commercial sense has already been verified…Keith and I want this sorted ASAP - within the next 48 hrs."

26. On December 20, 2013, as both CBA and ServiceMesh staff were trying to get appropriate approvals for the deal, Waldron sent an email to Hunter which provided, "I am in Santa Monica office with Eric [Pulier]…Eric has had the same fun and games with CSC lawyers as we have had. Amusing to see Eric in the midst of it." Later that day, Waldron sent an email to Pulier which provided, "I think we may have just about pulled this one off!! Hopefully later this evening we can raise a glass to another deal done." Pulier responded, "Awesome!!!"

27.   On December 21, 2013, Waldron exchanged several emails with his wife in which he detailed the recently signed CBA-McAfee deal that he valued at $11.5 million.  As they discussed personal financial issues, Waldron told his wife that Waldron was on the way to the airport soon and "By the way, confirmed: $1.5m."

28.   Additional emails demonstrate the collective effort by Waldron, Hunter, Twynham and Pulier to consummate additional contracts between CBA and ServiceMesh before the end of the Earnout Period.

29.   On January 6, 2014, Twynham sent Waldron draft contracts between CBA and ServiceMesh for several other software projects that Waldron "had discussed with Eric."  The same day, Waldron sent an email to Hunter stating, "I hear Eric has been calling you…he's getting nervous about the remaining TDs [contracts]."  Hunter replied, "Yes we caught up today…let's try to get them signed off this week."

30.   On January 25, 2014, Hunter received an email from his subordinate with nine contracts between CBA and ServiceMesh for additional software projects "broken down as discussed."  The contracts totaled $6.9 million, but separately they fell within Hunter's financial delegation and did not require additional management approvals.  Hunter replied, "Perfect let them fly."

11

31.   On January 29, 2014, two days before the Earnout
Period ended, Twynham sent an email to Waldron stating, "For
Rev[enue] Rec[ognition] purposes contractually I need to get a
software acceptance email from you…can we discuss the best way
to get this done?"

32.   On January 30, 2014, attached to an email courtesy
copied to executives at CSC, Pulier provided CSC with a Letter
of Representation in which he certified to CSC that for all
post-acquisition revenue earned by ServiceMesh from November 15,
2013 through January 31, 2014, ServiceMesh (a) provided CSC with
complete customer contract files and all supporting
documentation, (b) accurately and completely responded to all
queries by CSC in its review of the post-acquisition revenue,
and (c) did not enter into any side agreements in connection
with ServiceMesh sales agreements with customers in relation to
the Earnout period transactions.

**E.    The Earnout Payment**

33.   Continental Stock Transfer and Trust, based in New
York, New York, was the Exchange Agent that administered
payments due under the Purchase Agreement from CSC to
ServiceMesh's shareholders, and used an account at JP Morgan
Chase Bank for this purpose ("Exchange Agent Account").

34.   Based on the representations from Pulier and
ServiceMesh that it legitimately exceeded the Earnout Amount

12

revenue floor, CSC disbursed $98,034,058.00 to the Exchange
Agent Account on March 14, 2014.  But for these representations,
CSC would not have paid the Earnout Amount.

35.  Over the next several days, nearly all of the
$98,034,058.00 was transferred from the Exchange Agent Account
to the shareholders of ServiceMesh, including Pulier, Twynham,
Gyllstrom and TechAdvisors LLC.

F.  **Covert Discussions and Payments**

36.  On March 19, 2014, approximately $5.6 million was
transferred from the Exchange Agent Account to an account in the
name of TechAdvisors LLC at Citibank ("Citi-Tech").  Pulier, as
the CEO of TechAdvisors, is the sole signatory to this account.
In September 2013, in response to due diligence inquiries from
his counterparts at CSC, a ServiceMesh corporate development
executive falsely asserted that TechAdvisors was not controlled
by Pulier, stating that "Eric asked me to provide this
clarification to you both."

37.  On April 2, 2014, in response to Hunter's inquiry
regarding possible employment with CSC, Twynham stated in an
email, "The only thing Eric has to say on the topic is that he
is absolutely keen to do it but is concerned CSC just would not
have the comp plan that would get you here.  I told Eric that
you were more of the view that, that did not matter so much as

13

you where [sic] confident that Eric would take care of you on the back end…"

38.  On April 9, 2014, Gyllstrom sent an email to Pulier at his ServiceMesh account, stating, "Hoping to get the opportunity to make the rest of the million dollars we discussed."  Pulier replied, "let's get on the phone and talk about where we are with the earn-out and how to get to the next stages."  The same day, Pulier received a report from a ServiceMesh subordinate indicating that Gyllstrom had received approximately $700,000 due to his ownership stake in ServiceMesh.

39.  On April 12, 2014, Waldron sent a text message to Twynham that stated, "$$ landed.  Keith disappointed."  Twynham responded, "Not good.  Did Keith get some time with him."  Waldron responded: "Yes.  Keith (Hunter) at $750K.  But to be fair to Eric, it is actually more than the formula.  He was just hoping Eric would top it up to $1m."  Twynham replied, "$750k is a lot of money!" Later the same day, Twynham sent a text message to Hunter asking if he had been able to spend some time with Pulier.  Hunter responded, "Not really going to have a call."  Hunter encouraged them to stay in touch, but admonished Twynham, "Use gmail."

40.  On July 1, 2014, Twynham sent a text to Hunter, "Eric has committed political suicide and is inadvertently selling us

14

all down the river."  Hunter again instructed Twynham to send "an email update to gmail."

41.   Between June 25 and September 19, 2014, over $4.7 million was transferred from the Citi-Tech account to an account at Citibank in the name of Ace ("Citi-Ace").  Goldstein is the sole signatory to this account.

42.   On December 12, 2014, Waldron sent an instant message to Hunter, which included the following: "…EP [Pulier] wants to send us more money via ACE.  So he can clear it out before EOY [end of year] and avoid tax.  Told him I'll hold it ransom until we all land happily. Lol."  Hunter replied: "Lets meet up in am."

43.   The table below summarizes the total payments received through the transactions described above:

| **Recipient** | **Earnout** | **Ace** | **Total** |
|---|---|---|---|
| Pulier | $25,584,634 | N/A | $25,584,634 |
| Waldron | N/A | $1,800,000 | $1,800,000 |
| Hunter | N/A | $630,040 | $630,040 |
| Gyllstrom | $286,651 | $203,647[1] | $490,299 |
| Tech Advisors | $5,618,331.86 | N/A | $5,618,331.86 |

---

[1] On January 21, 2015, after the CBA investigation was known to Waldron, Hunter, Pulier and others, Gyllstrom sent a wire to Ace for the full amount of its prior payment to him.

### H.   CBA and CSC Investigations

44.   In October 2014, CBA became aware that Waldron and Hunter had received anomalous amounts of U.S. dollar transfers into their CBA bank accounts from accounts held by Ace and Goldstein.  Australian criminal investigators shared documents related to CBA's investigation of these payments, some of which are referenced below.

45.   On December 17, 2014, CBA investigators conducted interviews of both Waldron and Hunter.  Prior to these interviews, Waldron and Hunter communicated via their personal email accounts.  Hunter told Waldron, "I am so shocked I want to vomit. I cannot believe we were Tis [sic] stupid."  He continued, "List direct answer What we know.  We share no more then [sic] we have to nothing besides that…"

46.   When confronted with these transfers, Waldron and Hunter provided conflicting explanations for the payments to CBA investigators.  Hunter subsequently provided purported evidence in the form of invoices to Ace for work that he had done.  A forensic analysis of the documents by Ernst & Young, Australia, determined that the invoices had been created with a version of software not available as of the date of the invoices.  Hunter subsequently confessed to fabricating the invoices.

47.   On December 24, 2014, CBA terminated the employment of both Waldron and Hunter.

48. On January 3, 2015, the former chief information officer of CBA, now in the same role at another bank, contacted Pulier via e-mail after hearing about allegations of improper payments by ServiceMesh affiliates to recently-terminated CBA employees. Pulier responded that the allegations were "entirely untrue." The following day, Pulier sent a second email stating, "Now that I have had the opportunity to gather information into the actual focus of the inquiry, I am confident this will be concluded soon to everyone's satisfaction."

49. On January 5, 2015, Pulier sent an email to the private emails of Waldron and Hunter requesting that they return all funds to Ace. Although aware that both had already been terminated by CBA, Pulier justified the severing of their relationship because "proceeding now is not viable if CBA support was not in place as understood."

50. On March 31, 2015, CSC suspended Pulier while it conducted an internal investigation into his actions. On April 23, 2015, Pulier resigned from CSC after refusing to cooperate with the internal investigation.

51. In March, 2015, Hunter and Waldron were arrested by the New South Wales Police Force in Australia on charges related to their acceptance of bribes paid by Pulier through Tech Advisors and Ace.

52.   In March, 2016, Hunter provided a statement to the New South Wales Police Force.  Hunter stated that prior to the close of the CSC acquisition of ServiceMesh, Hunter and Waldron met with Pulier to discuss how they would be compensated for helping ServiceMesh achieve the Earnout payment.  In the time leading up to the CSC acquisition of ServiceMesh, Pulier stated that he would look after Hunter and Waldron.  Hunter and Waldron approved CBA purchase of ServiceMesh products and services during the Earnout period in order to help ServiceMesh achieve the Earnout payment.  Hunter knew the payments he and Waldron received from Ace came from Pulier and was a reward for the work Hunter and Waldron had done to make ServiceMesh a success, and was also recognition for the purchases Hunter and Waldron made for CBA during the Earnout period.

53.  In or about June, 2016, Hunter pled guilty in Australia to charges related to his acceptance of bribes paid by Pulier through Tech Advisors and Ace, and later entered into a cooperation and plea agreement with the United States Attorney's Office for the Central District of California.

54.  In or about December, 2016, Hunter was sentenced in Australia to a three-and-a-half year prison sentence on charges related to his acceptance of bribes paid by Pulier through Tech Advisors and Ace.

18

## V. TRACING OF CSC FUNDS TO THE SUBJECT FUNDS IN THE ALLIANCE

### BERNSTEIN ACCOUNTS

**B.    CSC Funds were received in Pulier's Living Trust Account EP 5414, Transferred to other Pulier Living Trust Accounts and then back to EP 5414**

55.  As noted in paragraph 34 (above), on March 14, 2014, CSC disbursed $98,034,058 to the Exchange Agent Account at Chase Bank, which funds were to be distributed to the ServiceMesh shareholders for the Earnout payment due to the above-described fraudulent actions of Pulier and his co-conspirators.

56.  Financial records obtained by the FBI from Alliance Bernstein, LLP show that on March 19, 2014, $25,584,634 of these CSC funds were wire transferred from the Chase Bank Exchange Agent Account to the Eric Pulier Living Trust account, EP 5414. At the time of this wire transfer, EP 5414 had an existing balance of $7,291,847.

57.  I have reviewed relevant financial records obtained by the FBI and they show that after receiving the $25,584,634 in EP 5414, Pulier transferred some of these funds to at least seven other living trust accounts he controlled, and later returned some of these same funds to EP 5414, as set forth below:

a.    Between July 23, 2014 and January 20, 2015, Pulier transferred $3,950,000 from EP 5414 to an Eric Pulier Living Trust account ending in 2405 ("EP 2405"), as follows:

19

| DATE: | AMOUNT: |
|---|---|
| July 23, 2014 | $1,500,000 |
| October 1, 2014 | $1,000,000 |
| October 7, 2014 | $500,000 |
| December 19, 2014 | $500,000 |
| December 23, 2014 | $250,000 |
| January 20, 2015 | $200,000 |

  i. On July 29th and September 30, 2014, Pulier transferred a total of $1,242,000 of the $3,950,000 from EP 2405 to the Eric Pulier Living Trust account ending in 2407 ("EP 2407") by transferring $750,000 and $492,000 on those dates, respectively.

  ii. Between July 15, 2016 and February 15, 2017, Pulier transferred a total of $2,128,424 from EP 2405 back to EP 5414.

  iii. On February 15, 2017, Pulier withdrew all remaining funds from EP 2405.

  b. Between December 19, 2014 and January 30, 2015, Pulier transferred $1,450,000 from EP 5414 to EP 2407, as follows:

| DATE: | AMOUNT |
|---|---|
| December 19, 2014 | $750,000 |
| December 23, 2014 | $250,000 |
| December 24, 2014 | $250,000 |
| January 30, 2015 | $200,000 |

i.   Between March 8, 2016, and January 23, 2017,
Pulier transferred a total of $2,684,171 from EP 2407 back to EP
5414.

ii.   On January 23, 2017, Pulier withdrew all
remaining funds from EP 2407.

c.   Between July 23, 2014 and January 30, 2015,
Pulier transferred $600,000 from EP 5414 to the Eric Pulier
Living Trust account ending in 2408 ("EP 2408"), as follows:

| DATE: | AMOUNT |
|---|---|
| July 23, 2014 | $500,000 |
| January 30, 2015 | $100,000 |

i.   Between January 25th and February 15, 2017,
Pulier made two transfers totaling $570,323, from EP 2408 back
to EP 5414.

ii.   On February 15, 2017, Pulier withdrew all
remaining funds from EP 2408.

d.   On July 23, 2014, Pulier transferred $1,000,000
from EP 5414 to the Eric Pulier Living Trust account ending in
3054 ("EP 3054").  At the time of the transfer, EP 3054 already
had a balance of one million dollars.

i.   On January 23, 2017, Pulier transferred
$2,074,851 from EP 3054 to EP 5414.

ii.   On July 31, 2017, Pulier withdrew all
remaining funds from EP 3054.

21

   e. Between October 7th and December 24, 2014, Pulier transferred $1,000,000 from 5414 to the Eric Pulier Living Trust account ending in 5981 ("EP 5981"), as follows:

| DATE: | AMOUNT: |
|---|---|
| October 7, 2014 | $500,000 |
| December 23, 2014 | $250,000 |
| December 24, 2014 | $250,000 |

   i. Between April 19, 2016 and January 23, 2017, Pulier transferred a total of $979,333 from EP 5981 back to EP 5414.

   ii. On January 23, 2017, Pulier withdrew all remaining funds from EP 5981.

   f. Between April 24th and October 27, 2014, Pulier transferred a total of $2,000,000 from EP 5414 to EP 9018 (which already had a balance of $1,000,000), as follows:

| DATE: | AMOUNT: |
|---|---|
| April 24, 2014 | $1,000,000 |
| October 27, 2014 | $1,000,000 |

   i. On February 23, 2017, Pulier transferred $600,000 from EP 9018 back to EP 5414.

   ii. As of August 31, 2017, the balance in EP 9018 was $2,192,990.  Account records indicate that this balance is in the form of securities that were purchased with the $2,000,000 transferred from EP 5414.

   g. On December 8, 2014, Pulier transferred $1,800,000 from EP 5414 to EP 0806.  Account records indicate

that approximately $1,600,000 of the $1,800,000 was used to purchase securities in the account.  As of July 31, 2017, the balance in EP 0806 was $914,726. There have been no additional funds deposited into EP 0806, and only withdrawals, since December 2014.

58.   It is also noted that on November 18, 2014, Pulier deposited $5,111,266 into EP 5414 from the sale of his 82,585 shares of CSC stock.

59.   In sum, between April 24, 2014, and January 30, 2015, a period of about nine months, seven Eric Pulier Living Trust accounts received CSC funds from EP 5414 totaling $11,800,000. Six of these accounts subsequently returned $7,962,251 of these funds to EP 5414 between March 2016 and February 2017.  A detailed look at the account records further reveals that $6,323,250 of this $7,962,251 was transferred from the six accounts back to EP 5414 during the past year (i.e., from September 29, 2016 to present – or, more accurately, to the most recent financial records available, August 2017), as follows:

        a.   $1,488,423 from EP 2405;

        b.   $1,785,171 from EP 2407;

        c.   $570,323 from EP 2408;

        d.   $1,000,000 from EP 3054;

        e.   $879,333 from EP 5981;

        f.   $600,000 from EP 9018;

23

60.   On April 29, 2016, the balance in EP 5414 dropped below zero to a negative balance.  Although subsequent deposits were made intermittently (and many of these transfers are detailed above) the balance dropped to a negative balance about a dozen more times up until January 23, 2017.  Since January 2017, the balance of EP 5414 has grown and ranged from approximately $1.5 to $6.5 million.  Per account records, as of July 31, 2017, the balance in EP 5414 was $1,679,172.

**C.   CSC Funds were received into Pulier's children's Irrevocable Trust Accounts and mostly converted to securities in these accounts**

61.   On April 5, 2013, Pulier gave each of his four children a .2% interest in ServiceMesh.  On January 8, 2014, just prior to the conclusion of the Earnout period, Pulier created irrevocable trust accounts for each of his children at Alliance Bernstein, LLP.

62.   Per records obtained by the FBI and reviewed by me, on March 19, 2014, CSC Earnout funds were wired from the Exchange Agent Account to these trust accounts, as follows:

a.   $175,284 was wire transferred to CP 8372, the irrevocable trust account of Chloe B. Pulier, who was born in 2001.  At the time of the wire transfer there was $63,673 already in the account.  Some of the transferred funds were soon converted to securities in the account.  The account balance has remained above $175,284 since March 2014, and was $307,261 as of

24

July 31, 2017.

b.   $175,284.90 was wire transferred to GP 8373, the irrevocable trust account of Georgia B. Pulier, who was born in 2003.  At the time of the wire transfer there was $63,673 already in the account.  Some of the transferred funds were soon converted to securities in the account.  The account balance has remained above $175,284 since March 2014, and was $307,204 as of July 31, 2017.

c.   $175,088 was wire transferred to JP 8374, the irrevocable trust account of Jacob E. Pulier, who was born in 1997.  At the time of the wire transfer there was $63,579 already in the account.  Some of the transferred funds were soon converted to securities in the account.  The account balance has remained above $175,088 since March 2014, and was $307,187 as of July 31, 2017.

d.   $175,284 was wire transferred to WP 8375, the irrevocable trust account of William R. Pulier, who was born in 1999.  At the time of the wire transfer there was $63,673 already in the account.  Some of the transferred funds were soon converted to securities in the account.  The account balance has remained above $175,284 since March 2014, and was $307,252 as of July 31, 2017.

## VI. **CONCLUSION**

63.   Based upon the facts set forth above, there is
probable cause to believe that the SUBJECT FUNDS represent or are
traceable to proceeds of one or more violations of 18 U.S.C. §
1343 (wire fraud), a specified unlawful activity as defined in 18
U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).  The SUBJECT FUNDS are
therefore subject to seizure pursuant to 18 U.S.C. § 981(b) and
forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).  In addition,
the SUBJECT FUNDS are subject to seizure pursuant to 18 U.S.C. §
982(b) and 21 U.S.C. § 853(f) because there is probable cause to
believe that they would, in the event of conviction, be subject
to forfeiture, and an order under 21 U.S.C. § 853(e) may not be
sufficient to assure the availability of the property for
forfeiture.


/S/
_____
DANIEL M. PARKER,
Special Agent


Subscribed to and sworn before me

this  __28th__ day of September, 2017.


_____
HONORABLE  ROZELLA A. OLIVER

UNITED STATES MAGISTRATE JUDGE