Exhibit 2

1   NICOLA T. HANNA
2   United States Attorney
    LAWRENCE S. MIDDLETON
3   Assistant United States Attorney
    Chief, Criminal Division
4   STEVEN R. WELK
5   Assistant United States Attorney
    Chief, Asset Forfeiture Section
6   JONATHAN GALATZAN
    California Bar No. 190414
7   Assistant United States Attorney
8   Asset Forfeiture Section
       Federal Courthouse, 14th Floor
9      312 North Spring Street
       Los Angeles, California 90012
10     Telephone:  (213) 894-2727
11     Facsimile:  (213) 894-7177
       E-mail: Jonathan.Galatzan@usdoj.gov
12
    Attorneys for Plaintiff
13  UNITED STATES OF AMERICA

14                    UNITED STATES DISTRICT COURT
15             FOR THE CENTRAL DISTRICT OF CALIFORNIA
16                        WESTERN DIVISION
17

18  UNITED STATES OF AMERICA,        ) NO. CV 18-2560
                                     )
19            Plaintiff,             ) COMPLAINT FOR FORFEITURE
                                     )
20       v.                          ) 18 U.S.C. §§ 981(a)(1)(A) and
                                     )(C) and 984
21  $1,912,876.00 SEIZED FROM        )
    ALLIANCE BERNSTEIN ACCOUNT       )[F.B.I.]
22  NUMBER XXX-5414, $1,400,000.00   )
    SEIZED FROM ALLIANCE BERNSTEIN   )
23  ACCOUNT NUMBER XXX-9018,         )
    $884,060.00 SEIZED FROM          )
24  ALLIANCE BERNSTEIN ACCOUNT       )
    NUMBER XXX-0806, $175,284.00     )
25  SEIZED FROM ALLIANCE BERNSTEIN   )
    ACCOUNT NUMBER XXX-8372,         )
26  $175,284.00 SEIZED FROM          )
    ALLIANCE BERNSTEIN ACCOUNT       )
27  NUMBER XXX-8373, $175,088.00     )
    SEIZED FROM ALLIANCE BERNSTEIN   )
28  ACCOUNT NUMBER XXX-8374 AND      )

1  $175,284.00 SEIZED FROM          )
   ALLIANCE BERNSTEIN ACCOUNT       )
2  NUMBER XXX-8375,                 )
                                    )
3            Defendants.            )
                                    )

4      For its claims against the defendants $1,912,876.00 Seized

5  From Alliance Bernstein Account Number XXX-5414, $1,400,000.00

6  Seized From Alliance Bernstein Account Number XXX-9018,

7  $884,060.00 Seized From Alliance Bernstein Account Number XXX-

8  0806, $175,284.00 Seized From Alliance Bernstein Account Number

9  XXX-8372, $175,284.00 Seized From Alliance Bernstein Account

10 Number XXX-8373, $175,088.00 Seized From Alliance Bernstein

11 Account Number XXX-8374, and $175,284.00 Seized From Alliance

12 Bernstein Account Number XXX-8375 (collectively, the "defendant

13 bank funds"), plaintiff United States of America alleges as

14 follows:

15                 JURISDICTION AND VENUE

16     1.   This is a civil forfeiture action brought pursuant to

17 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984.

18     2.   This Court has jurisdiction over the matter under 28

19 U.S.C. §§ 1345 and 1355.

20     3.   Venue lies in this district pursuant to 28 U.S.C.

21 § 1395(b).

22                 PERSONS AND ENTITIES

23     4.   The plaintiff is the United States of America.

24     5.   The defendants were seized on September 28, 2017

25 pursuant to a federal seizure warrant at L.P. Alliance

26 Bernstein, 1999 Avenue of the Stars, 2nd Floor, Los Angeles,

27 California and consist of $1,912,876.00 Seized From Alliance

28
                                    2

1  Bernstein Account Number XXX-5414 ("AB 5414")[1], which account is

2  held in the name of Eric Pulier; $1,400,000.00 Seized From

3  Alliance Bernstein Account Number XXX-9018 ("AB 9018"), which

4  account is held in the name of Eric Pulier; $884,060.00 Seized

5  From Alliance Bernstein Account Number XXX-0806 ("AB 0806"),

6  which account is held in the name of Eric Pulier; $175,284.00

7  Seized From Alliance Bernstein Account Number XXX-8372 ("AB

8  8372"), which account is held in the name of C.P.;[2] $175,284.00

9  Seized From Alliance Bernstein Account Number XXX-8373 ("AB

10  8373"), which account is held in the name of G.P; $175,088.00

11  Seized From Alliance Bernstein Account Number XXX-8374 ("AB

12  8374"), which account is held in the name of J.P.; and

13  $175,284.00 Seized From Alliance Bernstein Account Number XXX-

14  8375 ("AB 8375"), which account is held in the name of W.P.

15      6.    The interests of Eric Pulier, C.P., G.P., J.P., W.P.,

16  and Computer Sciences Corporation may be adversely affected by

17  these proceedings.

18      7.    The defendant bank funds are in the custody of the

19  United States Marshals Service in this District, where they

20  shall remain subject to this Court's jurisdiction during the

21  pendency of this action.

22                    EVIDENCE SUPPORTING FORFEITURE

23      8.    Between at least October 2013 and the present, certain

24  shareholders of ServiceMesh, Inc. of Santa Monica, California

25  [1] Pursuant to Fed. R. Civ. P. 5.2(a)(4) and Local Rule 5.2.1,

26  only the last four digits of bank account numbers are set forth
   in this Complaint.

27

28  [2] Pursuant to Federal Rule of Civil Procedure 5.2, minors are
   identified by the initials of first and last names.

3

1   ("ServiceMesh"), engaged in a scheme to fraudulently inflate the
2   revenue of ServiceMesh in order to generate unwarranted,
3   incentive-based compensation for ServiceMesh shareholders and
4   generate bribes and kickbacks to their accomplices.  The result
5   of this scheme was that the publicly traded company (Computer
6   Sciences Corporation) that acquired ServiceMesh in October 2013
7   overpaid a variable incentive payment to ServiceMesh and its
8   shareholders by approximately $98 million.

9                   **The Principals**

10       9.   Eric Pulier ("Pulier") was the founder and, through
11   affiliated entities, approximately 30% owner of ServiceMesh, an
12   information technology ("IT") services company based in Santa
13   Monica, California.  Pulier was also the founder and owner of
14   TechAdvisors LLC, a Delaware corporation.

15      10.   Andrew Goldstein ("Goldstein") was Pulier's longtime
16   friend and the control person for Ace Inc., aka Ace Foundation
17   ("Ace"), a purported non-profit entity incorporated in Delaware.
18   On an IRS Form W-9 completed by Goldstein for Ace on May 30,
19   2014, Ace's address was initially listed as ServiceMesh's
20   corporate headquarters in Santa Monica, California.  This was
21   subsequently crossed-out and replaced with Goldstein's residence
22   in Beverly Hills, California.  On or about January 14, 2015,
23   after the commencement of investigations by both Australian
24   criminal authorities and Computer Sciences Corporation ("CSC"),
25   Ace changed its name from Ace Inc. to Ace Foundation.

26      11.   Jon Waldron ("Waldron") and his supervisor, Keith
27   Hunter ("Hunter"), were IT executives at Commonwealth Bank of
28   Australia ("CBA"), the largest publicly-traded company in

                                4

1  Australia.  Hans Gyllstrom ("Gyllstrom") was an IT consultant to
2  CBA since 2007.

3      12.  Bradley Martin Lewis Twynham ("Twynham") was a
4  ServiceMesh employee based in Australia and, later, California,
5  who helped manage the relationship with CBA.

6      13.  CSC is a New York Stock Exchange listed company,
7  headquartered in Falls Church, Virginia, and also involved in IT
8  services.

9          **The Contract**

10     14.  Pursuant to an agreement entered into on October 29,
11 2013 and amended on November 15, 2013, CSC agreed to acquire all
12 of ServiceMesh's outstanding stock for a fixed cash amount at
13 closing plus a variable incentive payment ("Earnout Amount")
14 based on ServiceMesh's revenues between January 1, 2013 and
15 January 31, 2014 ("Earnout Period").  For every $1 in
16 ServiceMesh revenue generated during the Earnout Period in
17 excess of a $20 million floor, ServiceMesh shareholders would
18 collectively receive approximately $10.15 in Earnout Amount, up
19 to a maximum of approximately $137 million.

20     15.  In February 2014, CSC calculated that ServiceMesh had
21 generated approximately $29.7 million in revenue creditable
22 toward the Earnout Amount, including approximately $10.4 million
23 attributable to CBA.  As a result of generating approximately
24 $9.7 million in revenue in excess of the floor, ServiceMesh
25 shareholders were credited an Earnout Amount of approximately
26 $98 million.  Without the revenue attributable to CBA,
27 ServiceMesh shareholders would not have received any Earnout
28 Amount.

1

**The ServiceMesh/CBA Relationship**

2      16.   ServiceMesh began providing IT services to CBA in
3   2009.   Waldron, with direction from Pulier, actively lobbied CBA
4   to hire Hunter as Waldron's supervisor at CBA and encouraged
5   Hunter to accept the position.   On April 10, 2010, Pulier sent
6   an email to Waldron regarding an upcoming dinner hosted by
7   ServiceMesh for Hunter.   Pulier said, "The purpose of getting
8   Keith [Hunter] with you earlier (before he gets the job) is to
9   establish you as the go-to guy…leave him with a few take-aways:
10  he wants the job, he is not in it alone, there are people at the
11  bank that he can rely upon and trust."

12      17.   On July 27, 2011, Hunter's first day of employment at
13  CBA, Pulier sent an email to Hunter profiling several CBA
14  executives and projects, concluding with, "We have your back on
15  every level."

16      18.   Pulier, Waldron, Twynham and Gyllstrom had a
17  longstanding social connection.   In a July 2010 email, Twynham
18  informed Pulier that Waldron had been advised by a senior CBA
19  executive not to personally approve travel for Twynham and
20  Pulier as "it would be a conflict of interest" and mentioned
21  Waldron's "birthday bash in Canne [sic] as evidence of hos [sic]
22  friendship with you."   In addition, Waldron invited Gyllstrom
23  and Pulier to an April 2011 bachelor party for Twynham in
24  Sydney, Australia.   Twynham was best man in Waldron's 2012
25  wedding, to which Pulier was invited.

26      19.   On May 24, 2011, Waldron sent an email to Pulier and
27  Twynham that provided, "Where the money goes…(confidential of
28  course)."   Attached to the email was a document labeled as

6

1  confidential and containing CBA's budgeted IT spending for 2011
2  and 2012.

3      20.  The following emails demonstrate efforts by Waldron
4  and Hunter to expedite the consummation of a deal whereby CBA
5  would purchase security technology products by McAfee, Inc.
6  ("McAfee") from ServiceMesh (the "CBA-McAfee" transactions)
7  rather than continuing to procure them directly from McAfee or
8  via equipment purchased from another vendor that included McAfee
9  products.

10     21.  On October 31, 2013, the day after the CSC acquisition
11 of ServiceMesh was announced, a CBA colleague sent an email to
12 Waldron responding to his inquiry about the current McAfee
13 relationship, stating that it generated $2.4 million per year in
14 business between CBA and McAfee.  Later that day, Waldron
15 forwarded that email to Hunter with his own message, "This is
16 what I'm aiming to get thru on SM [ServiceMesh] paper.  Have
17 checked, and since the licenses are perpetual the full amount
18 qualifies as in-year revenue.  So here's $7m for them.  It's now
19 with Brad [Twynham] and Eric [Pulier] to sign up a partner
20 agreement with McAfee."

21     22.  On November 2, 2013, Twynham sent an email to Waldron
22 asking if Waldron had "been able to find me a contact at McAfee
23 to talk with?"  Waldron forwarded the email to a CBA colleague,
24 who at the instruction of Waldron sent directly to Twynham the
25 contact information for CBA's relationship manager at McAfee.

26     23.  On December 9, 2013, Twynham sent an email to Waldron
27 indicating that ServiceMesh's proposal for the CBA-McAfee deal
28 would be $8.8 million for three years (over $1.5 million dollars

1    more than the comparable products procured directly from

2    McAfee).   Twynham stated, "…I need to sit down with you and

3    explain what ServiceMesh need from a rev[enue] rec[ognition]

4    perspective and work through those numbers…"

5         24.  On December 16, 2013, Twynham sent an email to Waldron

6    indicating that Marcus Nicholson, a CBA employee who was tasked

7    to review the CBA-McAfee contract, had raised several objections

8    to various points.  Waldron forwarded the message to Hunter.

9    The same day, Hunter sent a message to Waldron instructing

10   Waldron to engage with Nicholson's supervisor and let the

11   supervisor know that Waldron needed the supervisor to step in

12   "ASAP."  The supervisor responded promptly, raising his own

13   concerns regarding a deal that "came out of the blue" under a

14   "challenging timeframe."  The supervisor further outlined the

15   various deal reviews that were underway, including pricing

16   ("…need to confirm that this is a better deal than the one we

17   already had from McAfee themselves…initial calcs were that this

18   was not a good deal"), legal ("just started the legal review

19   today") and risk ("engaged today").

20        25.  On December 16, 2013, a CBA risk manager sent an email

21   that a risk assessment for the CBA-McAfee deal would take more

22   than one day, to which Waldron replied, "…both Keith and I want

23   this deal done ASAP. Within the next 48hrs max…we're just buying

24   software! … Why are we even doing a risk assessment?"

25        26.  On December 17, 2013, Nicholson asked Twynham for a

26   break-out of the revenue for McAfee products versus ServiceMesh

27   products "in order to valid [sic] this deal as making commercial

28   sense."  Waldron, who was copied on the correspondence, replied,

1    "Commercial sense has already been verified…Keith and I want
2    this sorted ASAP - within the next 48 hrs."
3         27.  On December 20, 2013, as both CBA and ServiceMesh
4    staff were trying to get appropriate approvals for the deal,
5    Waldron sent an email to Hunter which provided, "I am in Santa
6    Monica office with Eric [Pulier]…Eric has had the same fun and
7    games with CSC lawyers as we have had. Amusing to see Eric in
8    the midst of it."  Later that day, Waldron sent an email to
9    Pulier which provided, "I think we may have just about pulled
10   this one off!! Hopefully later this evening we can raise a glass
11   to another deal done."  Pulier responded, "Awesome!!!"
12        28.  On December 21, 2013, Waldron exchanged several emails
13   with his wife in which he detailed the recently signed CBA–
14   McAfee deal that he valued at $11.5 million.  As they discussed
15   personal financial issues, Waldron told his wife that Waldron
16   was on the way to the airport soon and "By the way, confirmed:
17   $1.5m."
18        29.  Additional emails demonstrate the collective effort by
19   Waldron, Hunter, Twynham and Pulier to consummate additional
20   contracts between CBA and ServiceMesh before the end of the
21   Earnout Period.
22        30.  On January 6, 2014, Twynham sent Waldron draft
23   contracts between CBA and ServiceMesh for several other software
24   projects that Waldron "had discussed with Eric."  The same day,
25   Waldron sent an email to Hunter stating, "I hear Eric has been
26   calling you…he's getting nervous about the remaining TDs
27   [contracts]."  Hunter replied, "Yes we caught up today…let's try
28   to get them signed off this week."

1    31.  On January 25, 2014, Hunter received an email from his
2  subordinate with nine contracts between CBA and ServiceMesh for
3  additional software projects "broken down as discussed."  The
4  contracts totaled $6.9 million, but separately they fell within
5  Hunter's financial delegation and did not require additional
6  management approvals.  Hunter replied, "Perfect let them fly."

7    32.  On January 29, 2014, two days before the Earnout
8  Period ended, Twynham sent an email to Waldron stating, "For
9  Rev[enue] Rec[ognition] purposes contractually I need to get a
10  software acceptance email from you…can we discuss the best way
11  to get this done?"

12    33.  On January 30, 2014, attached to an email courtesy
13  copied to executives at CSC, Pulier provided CSC with a Letter
14  of Representation in which he certified to CSC that for all
15  post-acquisition revenue earned by ServiceMesh from November 15,
16  2013 through January 31, 2014, ServiceMesh (a) provided CSC with
17  complete customer contract files and all supporting
18  documentation, (b) accurately and completely responded to all
19  queries by CSC in its review of the post-acquisition revenue,
20  and (c) did not enter into any side agreements in connection
21  with ServiceMesh sales agreements with customers in relation to
22  the Earnout period transactions.

23          **Earnout Payment**

24    34.  Continental Stock Transfer and Trust, based in New
25  York, New York, was the Exchange Agent that administered
26  payments due under the Purchase Agreement from CSC to
27  ServiceMesh's shareholders, and used an account at JP Morgan
28  Chase Bank for this purpose ("Exchange Agent Account").

1       35.  Based on the representations from Pulier and
2   ServiceMesh that it legitimately exceeded the Earnout Amount
3   revenue floor, CSC disbursed $98,034,058.00 to the Exchange
4   Agent Account on March 14, 2014.  But for these representations,
5   CSC would not have paid the Earnout Amount.
6       36.  Over the next several days, nearly all of the
7   $98,034,058.00 was transferred from the Exchange Agent Account
8   to the shareholders of ServiceMesh, including Pulier, Twynham,
9   Gyllstrom and TechAdvisors LLC.
10                **Covert Discussions and Payments**
11      37.  On March 19, 2014, approximately $5.6 million was
12  transferred from the Exchange Agent Account to an account in the
13  name of TechAdvisors LLC at Citibank ("Citi-Tech").  Pulier is
14  the sole signatory to this account.  On a form for TechAdvisors
15  filed on January 17, 2013, with the State of California, Pulier
16  signed as the entity's CEO.
17      38.  On April 2, 2014, in response to Hunter's inquiry
18  regarding possible employment with CSC, Twynham stated in an
19  email, "The only thing Eric has to say on the topic is that he
20  is absolutely keen to do it but is concerned CSC just would not
21  have the comp plan that would get you here.  I told Eric that
22  you were more of the view that, that did not matter so much as
23  you where [sic] confident that Eric would take care of you on
24  the back end…"
25      39.  On April 9, 2014, Gyllstrom sent an email to Pulier at
26  his ServiceMesh account, stating, "Hoping to get the opportunity
27  to make the rest of the million dollars we discussed."  Pulier
28  replied, "let's get on the phone and talk about where we are

1   with the earn-out and how to get to the next stages." The same

2   day, Pulier received a report from a ServiceMesh subordinate

3   indicating that Gyllstrom had received approximately $700,000

4   due to his ownership stake in ServiceMesh.

5       40.  On April 12, 2014, Waldron sent a text message to

6   Twynham that stated, "$$ landed. Keith disappointed." Twynham

7   responded, "Not good. Did Keith get some time with him."

8   Waldron responded: "Yes. Keith (Hunter) at $750K. But to be

9   fair to Eric, it is actually more than the formula. He was just

10  hoping Eric would top it up to $1m." Twynham replied, "$750k is

11  a lot of money!" Later the same day, Twynham sent a text message

12  to Hunter asking if he had been able to spend some time with

13  Pulier. Hunter responded, "Not really going to have a call."

14  Hunter encouraged them to stay in touch, but admonished Twynham,

15  "Use gmail."

16      41.  On July 1, 2014, Twynham sent a text to Hunter, "Eric

17  has committed political suicide and is inadvertently selling us

18  all down the river." Hunter again instructed Twynham to send

19  "an email update to gmail."

20      42.  Between June 25 and September 19, 2014, over $4.7

21  million was transferred from the Citi-Tech account to an account

22  at Citibank in the name of Ace ("Citi-Ace"). Goldstein is the

23  sole signatory to this account.

24      43.  On December 12, 2014, Waldron sent an instant message

25  to Hunter, which included the following: "…EP [Pulier] wants to

26  send us more money via ACE. So he can clear it out before EOY

27  [end of year] and avoid tax. Told him I'll hold it ransom until

28

12

1  we all land happily. Lol." Hunter replied: "Lets meet up in

2  am."

3      44.  The table below summarizes the total payments received

4  through the transactions described above:

| Recipient | Earnout | Ace | Total |
|-----------|---------|-----|-------|
| Pulier | $25,584,634 | N/A | $25,584,634 |
| Waldron | N/A | $1,800,000 | $1,800,000 |
| Twynham | $935,539 | N/A | $935,539 |
| Hunter | N/A | $630,040 | $630,040 |
| Gyllstrom | $286,651 | $203,647[3] | $490,299 |

**CBA and CSC Investigations**

    45.  In October 2014, CBA became aware that Waldron and

Hunter had received anomalous amounts of U.S. dollar transfers

into their CBA bank accounts from accounts held by Ace and

Goldstein.

    46.  On December 17, 2014, CBA investigators conducted

interviews of both Waldron and Hunter. Prior to these

interviews, Waldron and Hunter communicated via their personal

email accounts. Hunter told Waldron, "I am so shocked I want to

vomit. I can not believe we were Tis [sic] stupid." He

continued, "List direct answer What we know. We share no more

then [sic] we have to nothing besides that…"

    47.  When confronted with these transfers, Waldron and

Hunter provided conflicting explanations for the payments.

Hunter subsequently provided purported evidence in the form of

---

[3] On January 21, 2015, after the CBA investigation was known to
Waldron, Hunter, Pulier and others, Gyllstrom sent a wire to Ace
for the full amount of its prior payment to him.

1   invoices to Ace for work that he had done.  A forensic analysis
2   of the documents by Ernst & Young, Australia, determined that
3   the invoices had been created with a version of software not
4   available as of the date of the invoices.  Hunter subsequently
5   confessed to fabricating the invoices.
6       48.  On December 24, 2014, CBA terminated the employment of
7   both Waldron and Hunter.
8       49.  On January 3, 2015, the former chief information
9   officer of CBA, now in the same role at another bank, contacted
10  Pulier after hearing about allegations of improper payments by
11  ServiceMesh affiliates to recently-terminated CBA employees.
12  Pulier responded that the allegations were "entirely untrue."
13  The following day, Pulier sent a second email stating, "Now that
14  I have had the opportunity to gather information into the actual
15  focus of the inquiry, I am confident this will be concluded soon
16  to everyone's satisfaction."
17      50.  On January 5, 2015, Pulier sent an email to the
18  private emails of Waldron and Hunter requesting that they return
19  all funds to Ace.  Although aware that both had already been
20  terminated by CBA, Pulier justified the severing of their
21  relationship because "proceeding now is not viable if CBA
22  support was not in place as understood."
23      51.  CBA determined that the value of the products and
24  services provided by ServiceMesh to CBA in the contracts
25  described was inflated by approximately 65 percent.
26      52.  On March 31, 2015, CSC suspended Pulier while it
27  conducted an internal investigation into his actions.  On April
28  23, 2015, Pulier resigned from CSC.  CSC has claimed that Pulier

14

 1 resigned after refusing to cooperate with the internal
 2 investigation.
 3     53.  Twynham was initially cooperative with CSC's internal
 4 investigation, but departed the United States to Australia on
 5 June 1, 2015, without notice.  In or about July 2015, CSC
 6 notified Twynham of its intent to terminate his employment for
 7 failure to cooperate with their investigation.
 8     54.  In March, 2015, Hunter and Waldron were arrested by
 9 the New South Wales Police Force in Australia on charges related
10 to their acceptance of bribes paid by Pulier through Tech
11 Advisors and Ace.
12     55.  In March, 2016, Hunter provided a statement to the New
13 South Wales Police Force.  Hunter stated that prior to the close
14 of the CSC acquisition of ServiceMesh, Hunter and Waldron met
15 with Pulier to discuss how they would be compensated for helping
16 ServiceMesh achieve the Earnout payment.  In the time leading up
17 to the CSC acquisition of ServiceMesh, Pulier stated that he
18 would look after Hunter and Waldron.  Hunter and Waldron
19 approved CBA's purchase of ServiceMesh products and services
20 during the Earnout period in order to help ServiceMesh achieve
21 the Earnout payment.  Hunter knew the payments he and Waldron
22 received from Ace came from Pulier and were a reward for the
23 work Hunter and Waldron had done to make ServiceMesh a success,
24 and was also recognition for the purchases Hunter and Waldron
25 made for CBA during the Earnout period.
26     56.  In or about June, 2016, Hunter pled guilty in
27 Australia to charges related to his acceptance of bribes paid by
28 Pulier through Tech Advisors and Ace, and later entered into a

1  cooperation and plea agreement with the United States Attorney's
2  Office for the Central District of California.

3      57.  In or about December, 2016, Hunter was sentenced in
4  Australia to a three-and-a-half year prison sentence on charges
5  related to his acceptance of bribes paid by Pulier through Tech
6  Advisors and Ace.

7      58.  On September 27, 2017, a Grand Jury in this District
8  returned an Indictment against Pulier and Waldron, in the case
9  of *United States v. Eric Pulier and Jon Waldron*, CR 17-00599 AB,
10 charging Pulier and Waldron with violating 18 U.S.C. § 1349
11 (Conspiracy to Commit Securities Fraud and Wire Fraud); 18
12 U.S.C. § 1348 (Securities Fraud); 18 U.S.C. § 1343 (Wire Fraud);
13 18 U.S.C. § 1952(a)(3)(Travel Act – Interstate Wires in Aid of
14 Commercial Bribery); 18 U.S.C. § 1503(a)(Obstruction of
15 Justice); 26 U.S.C. § 7206(1)(Filing False Tax Return); and 18
16 U.S.C. § 2 (Aiding and Abetting and Causing an Act to be Done).

17                    **TRACING THE DEFENDANT BANK FUNDS**

18     59.  As noted in paragraph 35 above, on March 14, 2014, CSC
19 disbursed $98,034,058 to the Exchange Agent Account at Chase
20 Bank, which funds were to be distributed to the ServiceMesh
21 shareholders for the Earnout payment due to the above-described
22 fraudulent actions of Pulier and his co-conspirators.

23     60.  On March 19, 2014, $25,584,634 of these CSC funds were
24 wire transferred from the Chase Bank Exchange Agent Account to
25 the AB 5414.  At the time of this wire transfer, AB 5414 had an
26 existing balance of $7,291,847. (The government seized
27 $1,912,876 from AB 5414 on September 28, 2017).

28

1      61.  After receiving the $25,584,634 in AB 5414, Pulier
2 transferred some of these funds to at least seven other living
3 trust accounts he controlled, and later returned some of these
4 same funds to AB 5414, as set forth below:

5      a.  Between July 23, 2014 and January 20, 2015,
6 Pulier transferred $3,950,000 from AB 5414 to an Eric Pulier
7 Living Trust account at Alliance Bernstein with the last four
8 digits ending in 2405 ("AB 2405"), as follows:

9         DATE:                  AMOUNT:

| DATE: | AMOUNT: |
|---|---|
| July 23, 2014 | $1,500,000 |
| October 1, 2014 | $1,000,000 |
| October 7, 2014 | $500,000 |
| December 19, 2014 | $500,000 |
| December 23, 2014 | $250,000 |
| January 20, 2015 | $200,000 |

16      i.  On July 29 and September 30, 2014, Pulier
17 transferred $1,242,000 of the $3,950,000 from AB 2405 to the
18 Eric Pulier Living Trust account at Alliance Bernstein with the
19 last four digits ending in 2407 ("AB 2407") by transferring
20 $750,000 and $492,000 on those dates, respectively.

21      ii.  Between July 15, 2016 and February 15, 2017,
22 Pulier transferred $2,128,424 from AB 2405 back to AB 5414.

23      iii. On February 15, 2017, Pulier withdrew all
24 remaining funds from AB 2405.

25      b.  Between December 19, 2014 and January 30, 2015,
26 Pulier transferred $1,450,000 from AB 5414 to AB 2407, as
27 follows:

28         DATE:                  AMOUNT

| | |
|---|---|
| December 19, 2014 | $750,000 |
| December 23, 2014 | $250,000 |
| December 24, 2014 | $250,000 |
| January 30, 2015 | $200,000 |

      i.  Between March 8, 2016, and January 23, 2017, Pulier transferred $2,684,171 from AB 2407 back to AB 5414.

      ii.  On January 23, 2017, Pulier withdrew all remaining funds from AB 2407.

      c.  Between July 23, 2014 and January 30, 2015, Pulier transferred $600,000 from AB 5414 to the Eric Pulier Living Trust account at Alliance Bernstein with the last four digits ending in 2408 ("AB 2408"), as follows:

| DATE: | AMOUNT |
|---|---|
| July 23, 2014 | $500,000 |
| January 30, 2015 | $100,000 |

      i.  Between January 25th and February 15, 2017, Pulier made two transfers totaling $570,323, from AB 2408 back to AB 5414.

      ii.  On February 15, 2017, Pulier withdrew all remaining funds from AB 2408.

      d.  On July 23, 2014, Pulier transferred $1,000,000 from AB 5414 to an Eric Pulier Living Trust account at Alliance Bernstein with the last four digits ending in 3054 ("AB 3054"). At the time of the transfer, AB 3054 already had a balance of one million dollars.

      i.  On January 23, 2017, Pulier transferred $2,074,851 from AB 3054 to AB 5414.

18

1          ii.   On July 31, 2017, Pulier withdrew all
2    remaining funds from AB 3054.

3          e.   Between October 7 and December 24, 2014, Pulier
4    transferred $1,000,000 from AB 5414 to an Eric Pulier Living
5    Trust account at Alliance Bernstein with the last four digits
6    ending in 5981 ("AB 5981"), as follows:

7          DATE:                    AMOUNT:
8          October 7, 2014          $500,000
9          December 23, 2014        $250,000
10         December 24, 2014        $250,000

11         i.   Between April 19, 2016 and January 23, 2017,
12   Pulier transferred $979,333 from AB 5981 back to AB 5414.

13         ii.   On January 23, 2017, Pulier withdrew all
14   remaining funds from AB 5981.

15   **Tracing of Defendant $1,400,000.00 seized from AB 9018**

16         f.   Between April 24 and October 27, 2014, Pulier
17   transferred $2,000,000 from AB 5414 to AB 9018 (which already
18   had a balance of $1,000,000), as follows:

19         DATE:                    AMOUNT:
20         April 24, 2014           $1,000,000
21         October 27, 2014         $1,000,000

22         i.   On February 23, 2017, Pulier transferred
23   $600,000 from AB 9018 back to AB 5414, which left a balance of
24   $1,400,000 in tainted funds in AB 9018 that the government
25   seized on September 28, 2017.

26   **Tracing of Defendant $884,060.00 seized from AB 0806**

27         g.   On December 8, 2014, Pulier transferred
28   $1,800,000 from AB 5414 to AB 0806.  Since December, 2014, there

1  were no additional funds deposited into AB 0806.  On September
2  28, 2017, the government seized $884,060.00 in tainted funds
3  from AB 0806.
4  **Tracing of Defendant $1,912,876.00 seized from AB 5414**
5  62.   On November 18, 2014, Pulier deposited $5,111,266
6  into AB 5414 from the sale of his 82,585 shares of CSC stock.
7  63.   During the nine months between April 24, 2014, and
8  January 30, 2015, seven Eric Pulier Living Trust accounts
9  received CSC funds from AB 5414 totaling $11,800,000.  Six of
10  these accounts subsequently returned $7,962,251 of these funds
11  to AB 5414 between March, 2016 and February, 2017.  Between
12  September, 2016 and September, 2017, $6,323,250 of this
13  $7,962,251 was transferred from the six accounts back to AB 5414
14  as follows:
15           a.   $1,488,423 from AB 2405;
16           b.   $1,785,171 from AB 2407;
17           c.   $570,323 from AB 2408;
18           d.   $1,000,000 from AB 3054;
19           e.   $879,333 from AB 5981; and
20           f.   $600,000 from AB 9018.
21  64.   On September 28, 2017, the government seized
22  $1,912,876.00 in tainted funds from AB 5414.
23  **Tracing of Defendant funds seized from Pulier's minor**
24  **children's accounts**
25  65.   On April 5, 2013, Pulier gave each of his four
26  children a .2% interest in ServiceMesh.  On January 8, 2014,
27  just prior to the conclusion of the Earnout period, Pulier
28

1   created irrevocable trust accounts for each of his children at
2   Alliance Bernstein, LLP.

3       66.  On March 19, 2014, CSC Earnout funds were wired from
4   the Exchange Agent Account (described in Paragraph 34 above) to
5   these trust accounts, as follows:

6           a.   $175,284 was wire transferred to AB 8372, the
7   irrevocable trust account of C.P., who was born in 2001.  The
8   account balance remained above $175,284 since the March, 2014
9   transfer.

10          b.   $175,284.90 was wire transferred to AB 8373, the
11  irrevocable trust account of G.P., who was born in 2003.  The
12  account balance remained above $175,284 since the March, 2014
13  transfer.

14          c.   $175,088 was wire transferred to AB 8374, the
15  irrevocable trust account of J.P., who was born in 1997.  The
16  account balance remained above $175,088 since the March, 2014
17  transfer.

18          d.   $175,284 was wire transferred to AB 8375, the
19  irrevocable trust account of W.P., who was born in 1999.  The
20  account balance remained above $175,284 since the March, 2014,
21  transfer.

22      67.  Based on the above, plaintiff alleges that the
23  defendant bank funds represent or are traceable to proceeds of
24  one or more violations of 18 U.S.C. § 1343 (wire fraud), a
25  specified unlawful activity as defined in 18 U.S.C. §§
26  1956(c)(7)(A) and 1961(1)(B).  The defendant bank funds are
27  therefore subject to forfeiture pursuant to 18 U.S.C. §
28  981(a)(1)(C). To the extent that the defendant bank funds are

21

1 | not the actual monies directly traceable to the illegal activity
2 | identified herein, plaintiff alleges that the defendant bank
3 | funds are identical property found in the same account as the
4 | property involved in the specified offense, rendering them
5 | subject to forfeiture pursuant to 18 U.S.C. § 984.

6 |     68.   Based on the above, Plaintiff alleges that the
7 | defendant bank funds constitute property involved in one or more
8 | transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or
9 | property traceable to such property, with the specified unlawful
10 | activity being violations of 18 U.S.C. § 1343 (wire fraud).  The
11 | defendant bank funds are therefore subject to forfeiture
12 | pursuant to 18 U.S.C. § 981(a)(1)(A).  To the extent that the
13 | defendant bank funds are not the actual monies directly
14 | traceable to the illegal activity identified herein, plaintiff
15 | alleges that the defendant bank funds are identical property
16 | found in the same account as the property involved in the
17 | specified offense, rendering them subject to forfeiture pursuant
18 | to 18 U.S.C. § 984.

19 |     69.   Based on the above, Plaintiff alleges that the
20 | defendant bank funds constitute property involved in one or more
21 | transactions in violation of 18 U.S.C. § 1957, or property
22 | traceable to such property, with the specified unlawful activity
23 | being violations of 18 U.S.C. § 1343 (wire fraud).  The
24 | defendant bank funds are therefore subject to forfeiture
25 | pursuant to 18 U.S.C. § 981(a)(1)(A).  To the extent that the
26 | defendant bank funds are not the actual monies directly
27 | traceable to the illegal activity identified herein, plaintiff
28 | alleges that the defendant bank funds are identical property

1   found in the same account as the property involved in the

2   specified offense, rendering them subject to forfeiture pursuant

3   to 18 U.S.C. § 984.

4        WHEREFORE, plaintiff United States of America prays:

5        (a)  that due process issue to enforce the forfeiture of

6   the defendant bank funds;

7        (b)  that due notice be given to all interested parties to

8   appear and show cause why forfeiture should not be decreed;

9        (c)  that this Court decree forfeiture of the defendant

10  bank funds to the United States of America for disposition

11  according to law; and

12       (d) for such other and further relief as this Court may

13  deem just and proper, together with the costs and disbursements

14  of this action.

15  DATED: March 30, 2018          NICOLA T. HANNA

16                                 United States Attorney
                                   LAWRENCE S. MIDDLETON
17                                 Assistant United States Attorney
                                   Chief, Criminal Division
18                                 STEVEN R. WELK
19                                 Assistant United States Attorney
                                   Chief, Asset Forfeiture Section

20

21                                  /s/ Jonathan Galatzan
                                   JONATHAN GALATZAN
22                                 Assistant United States Attorney

23                                 Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

24

25

26

27

28

                                   23

1              VERIFICATION

2      I, Daniel M. Parker, hereby declare that:

3      1.   I am a Special Agent with the Federal Bureau of

4  Investigation and I am the case agent for the forfeiture matter

5  entitled <u>United States of America v. $1,912,876.00 Seized From

6  Alliance Bernstein Account Number XXX-95414, et al.</u>

7      2.   I have read the above Verified Complaint for

8  Forfeiture and know its contents.  It is based upon my own

9  personal knowledge and reports provided to me by other law

10  enforcement agents.

11      3.   Everything contained in the Complaint is true and

12  correct, to the best of my knowledge and belief.

13      I declare under penalty of perjury that the foregoing is

14  true and correct.

15      Executed March 27th, 2018 in Los Angeles, California.

16

17                                    _____
                                       DANIEL M. PARKER

18

19

20

21

22

23

24

25

26

27

28

                            24

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | **CASE NUMBER** |
| | 2:18-cv-02560 SJO(MRWx) |
| v.                                                    PLAINTIFF(S) | |
| 1,912,876.00 Seized From Alliance Bernstein Account Number XXX-5414 et al | **ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 16-05 (RELATED CASES)** |
| DEFENDANT(S). | |

### CONSENT

I hereby consent to the transfer of the above-entitled case to my calendar pursuant to General Order 16-05.

APR 0 5 2018

_____
Date

R. Gary Klausner
United States District Judge

### DECLINATION

I hereby decline to transfer the above-entitled case to my calendar for the reasons set forth:

_____

_____

_____

_____

_____                          _____
Date                                              United States District Judge

### REASON FOR TRANSFER AS INDICATED BY COUNSEL

Case  2:15-cv-06794 RGK(AJWx)  and the present case:

☑ A.   Arise from the same or closely related transactions, happenings or events; or

☑ B.   Call for determination of the same or substantially related or similar questions of law and fact; or

☑ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D.   Involve one or more defendants from the criminal case in common, and would entail substantial duplication of labor if heard by different judges (applicable only on civil forfeiture action).

### NOTICE TO COUNSEL FROM CLERK

Pursuant to the above transfer, any discovery matters that are or may be referred to a Magistrate Judge are hereby transferred from Magistrate Judge _____ NA _____ to Magistrate Judge _____ NA _____.

On all documents subsequently filed in this case, please substitute the initials _____ RGK _____ after the case number in place of the initials of the prior judge, so that the case number will read  2:18-cv-02560 RGK(MRWx) . This is very important because the documents are routed to the assigned judges by means of these initials

cc:  ☐ Previous Judge      ☐ Statistics Clerk

CV-34 (10/16)                    ORDER RE TRANSFER PURSUANT TO GENERAL ORDER 16-05  (Related Cases)